UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RANDALL YANKER,<br><br>        Plaintiff,<br><br>    - vs -<br><br>ZOOMCAR, INC.,<br><br>        Defendant. | No. 23 CV 6847<br><br>**COMPLAINT**<br><br>Jury Demand |

Plaintiff Randall Yanker alleges as follows for his Complaint against Defendant Zoomcar, Inc.:

### I.  INTRODUCTION

1. In 2020, Defendant Zoomcar was a rental-car company in distress. Its CEO called on Plaintiff Randall Yanker — an experienced Wall Street consultant — to help rescue the company.

2. Zoomcar was short on cash and heavily in debt, so Yanker took the work on contingency. Under a written Consulting Agreement, (Exhibit A), Zoomcar promised Yanker at least two percent of the consideration in any future Zoomcar acquisition or securities offering, (*id.* ¶ 6).

3. Yanker worked intensely with Zoomcar for nearly two years. His advice transformed Zoomcar from a money-losing rental company into a financially stable tech business.

4. But Zoomcar's CEO Greg Moran refused to honor the Consulting Agreement. Mr. Moran claimed in writing that Zoomcar has no "continuing … obligations under the agreement," (Exhibit B), despite Yanker's express "continuing right" to payment. (Consulting Agreement ¶ 7.)

5. CEO Moran then used that bogus position to conceal Zoomcar's obligations under the Consulting Agreement from prospective investors.

6. Just months after repudiating the Consulting Agreement, Zoomcar finalized a $456 million agreement under which it will merge with a publicly-traded entity and list on NASDAQ.

7. Zoomcar insists it has no obligation to pay Yanker for his work, in flagrant disregard for the parties' contract. CEO Mr. Moran rebuffed months of requests from Yanker and his counsel to honor Zoomcar's promises. Left with no other option, Yanker brings this action seeking not less than $15 million in contractual damages and other relief.

## II. PARTIES

### A. Plaintiff Randall Yanker

8. Plaintiff Randall Yanker is a natural person who resides in South Carolina and works throughout the United States — including, as relevant under the Consulting Agreement, in New York.

9. Yanker has more than 40 years of experience on Wall Street, with expertise in strategic consulting and investment management.

10. Yanker is regularly engaged as a private consultant by corporate clients seeking strategic and financial advice. He specializes in helping early-stage and troubled companies to identify and overcome issues that impede their ability to attract investment opportunities.

11. In addition to his private consulting work, Yanker is Senior Partner and Founder of Alternative Asset Managers, II LLC, a private investment firm.

12. Prior to founding Alternative Asset Managers, Yanker was the CEO of Lehman Brothers Alternative Investment Management, where he was responsible for a multi-billion dollar global alternative investment platform.

13. Yanker serves as a Trustee of SEI Advisors' Inner Circle Fund III, a Delaware statutory trust providing investment management infrastructure to mutual funds, exchange-traded funds, and other funds; he is an Advisory Board member to Silicon Valley Data Capital, an early-stage venture fund focused on enterprise software companies.

14. Formerly, Yanker served on the Board of Directors of Navigator Global Investments Limited (Lighthouse Partners), a publicly-traded diversified alternative asset management company. He was a Trustee of the New School University.

### B. Defendant Zoomcar, Inc.

15. Defendant Zoomcar, Inc. is a corporation organized under the law of Delaware, headquartered in Bengaluru (Bangalore), India, and operating globally.

16. Zoomcar touts itself as "India's largest marketplace for … the cheapest car rental options."[1]

---

[1] *See* Zoomcar corporate website, <https://www.zoomcar.com/> (accessed Aug. 3, 2023).

17. Zoomcar was founded in 2012 by Greg Moran and David Back.

18. David Back is no longer affiliated with the company.

19. Zoomcar CEO Greg Moran has led Zoomcar since its inception. He holds a significant equity stake in the company and, on information and belief, has maintained his ownership interest through multiple rounds of outside investment even as other shareholders were diluted.

### III. JURISDICTION AND VENUE

20. Jurisdiction is proper under 28 U.S.C. § 1332.

21. Plaintiff Randall Yanker is a citizen of South Carolina for diversity purposes.

22. Defendant Zoomcar, Inc. is a citizen of Delaware and India for diversity purposes.

23. The amount in controversy exceeds the sum specified by 28 U.S.C. § 1332(a).

24. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred in the Southern District of New York.

25. Venue is also proper under 28 U.S.C. §§ 1391(b)(1) and 1391(d).

26. Defendant Zoomcar is subject to personal jurisdiction in the State of New York by virtue of its purposeful conduct in and towards, transaction of business in, and substantial contacts with, the State of New York — including conduct and contacts related to the negotiation, execution, performance, termination, repudiation, and breach of the Consulting Agreement. Among other things:

    (a) from in or about May 1, 2020 through the present, Zoomcar has had an ongoing contractual relationship with Yanker in New York;

    (b) at all times relevant to the claims in this Complaint, Yanker performed services under the Consulting Agreement in New York;

    (c) during the term of the Consulting Agreement, and at all times relevant to the claims in this Complaint, Zoomcar CEO Greg Moran resided in New York at his parents' home in Westchester County; worked in New York at and from offices in Westchester and New York Counties; and met,

      communicated and worked with Yanker in New York at and from offices in Westchester and New York Counties;

(d)    during the term of the Consulting Agreement, Zoomcar CEO Greg Moran, and other Zoomcar executives, agents, and advisors (including Yanker) actively pursued investments from, and partnership, merger and acquisition opportunities with, counterparties in New York;

(e)    Zoomcar CEO Greg Moran and Yanker negotiated the Consulting Agreement in New York using legal counsel in New York;

(f)    Zoomcar CEO Greg Moran executed the Consulting Agreement on behalf of Zoomcar in New York;

(g)    Yanker executed the Consulting Agreement in New York; and

(h)    Zoomcar purposefully availed itself of the protections of New York law by electing New York law to govern the Consulting Agreement. (Consulting Agreement (Ex. A) ¶ 9.)

## IV.   FACTS

### A.   Zoomcar CEO Greg Moran met Yanker in April 2020

27.    In or about April 2020, Yanker was introduced to Zoomcar CEO Greg Moran on a call arranged through mutual business associate Amar Duggal.

28.    During that introductory call, Zoomcar CEO Mr. Moran and Yanker discussed many of the challenges facing Zoomcar at the time, which included:

(a)    Zoomcar's principal sources of revenue depended on owning and renting cars to customers in developing countries. Zoomcar's asset-heavy business model, and its extensive operations in emerging markets, were unattractive to investors and to Western capital markets;

(b)    Despite receiving millions of dollars in investments over nearly a decade, Zoomcar had yet to turn a profit; it needed cash soon or it would default on its near-term financial obligations;

(c) The early stages of the COVID-19 pandemic, and the uncertain effects of the pandemic on consumer spending and behavior, threatened Zoomcar's very existence;

(d) New York financial markets were cooling, making it difficult to attract investors and raise capital; and

(e) Zoomcar's customers were in revolt — and its reputation was in tatters — over customer service gaffes such as a widely-publicized failure to issue refunds to customers (which stemmed from Zoomcar's cashflow crisis).

29. Even as these problems mounted, Zoomcar's investors and Board were pressuring CEO Mr. Moran to position the company for a merger or offering on a New York exchange. Many of those investors, and some Board members, were disappointed in — and losing patience with — Mr. Moran's poor performance as CEO.

30. Zoomcar CEO Mr. Moran sought to engage an experienced and reputable professional to address the challenges faced by the company.

31. In the near term, Zoomcar needed to identify investors and bring in capital to meet financial obligations, weather the pandemic, patch over its service problems, and sustain operations.

32. In the longer term, Zoomcar needed a major strategic overhaul to position itself favorably for a merger or public offering in New York.

33. During April and May 2020, Zoomcar CEO Greg Moran held a series of telephone calls and video conferences with Yanker, including from Mr. Moran's home and offices in New York, to solicit Yanker's advice about managing Zoomcar through its difficulties.

34. Yanker offered Mr. Moran expertise and strategic advice about Zoomcar's troubles, and Yanker brainstormed strategies for helping Zoomcar toward a merger or offering in the New York financial markets.

35. Mr. Moran also used Yanker as a sounding board for the CEO's feelings of insecurity, inexperience, and managerial self-doubt.

**B.  Zoomcar CEO Moran asked Yanker to join the company as a strategic consultant in May 2020**

36. In or about May 2020 — from his offices in New York — Zoomcar CEO Greg Moran formally asked Yanker to partner with Zoomcar as a consultant.

37. CEO Mr. Moran asked Yanker, among other things:

   (a) to identify Zoomcar's key performance indicators;

   (b) to design and implement strategic initiatives to make Zoomcar more attractive to potential acquirers, investors and New York capital markets;

   (c) to improve Zoomcar's marketing materials and investor relations department;

   (d) to evaluate Zoomcar's culture and personnel;

   (e) to introduce and promote Zoomcar to potential advisors, investors, and strategic partners;

   (f) to interact with and manage Zoomcar's outside professional advisers;

   (g) to work with Zoomcar's accountants in India and New York to update the company's financials; and

   (h) generally to position Zoomcar for a merger, SPAC or public offering.

38. Zoomcar CEO Mr. Moran and Yanker also discussed fair compensation for Yanker's consulting services — balancing Zoomcar's cash-poor position, and its urgent need for advice, against the high value of Yanker's experience and the opportunity value of his time.

39. Yanker rendered services and advice to Zoomcar and its CEO for months without a formal agreement. From in or about May 2020 through September 2020, Yanker relied on CEO Mr. Moran's promises that Zoomcar would compensate Yanker for his work. The company was in dire financial straits; Yanker mistakenly trusted Mr. Moran.

40. Eventually, in or about September 2020, Mr. Moran and Yanker settled on formal terms.

41. Zoomcar CEO Mr. Moran agreed that Zoomcar would pay Yanker with (a) a modest equity installment delivered up front; and (b) the majority of Yanker's compensation to be paid on

contingency, in cash and securities, if and only if Zoomcar achieved any acquisition, merger, public offering or other similar transaction.

42. With compensation agreed in principle, each of Zoomcar and Yanker brought in legal counsel to formalize the Consulting Agreement.

43. Yanker relied on his long-time New York counsel at Akin Gump Strauss Hauer & Feld LLP to negotiate the Consulting Agreement.

44. Zoomcar was represented by its corporate outside counsel, Paul Blumenstein.

**C.     Zoomcar and Yanker entered the Consulting Agreement effective May 2020**

45. To formalize their agreement, Zoomcar and Yanker negotiated and entered the written Consulting Agreement on or about October 16, 2020. (Ex. A.)

46. Zoomcar CEO Moran negotiated the Consulting Agreement from his offices in New York.

47. Yanker negotiated the Consulting Agreement from New York using counsel in New York.

48. Mr. Moran executed the Consulting Agreement on behalf of Zoomcar.

49. Mr. Moran executed the Consulting Agreement in New York.

50. Yanker executed the Consulting Agreement in New York.

51. On information and belief, before executing the Consulting Agreement on behalf of Zoomcar, CEO Mr. Moran presented the Consulting Agreement to Zoomcar's Board of Directors from Mr. Moran's New York office.

52. On information and belief, Zoomcar's Board of Directors approved the Consulting Agreement and authorized CEO Mr. Moran to execute it on behalf of the company.

**i.     Scope of the Consulting Agreement**

53. The Consulting Agreement "sets forth the terms and conditions of [Yanker's] consulting services with Zoomcar, Inc." (*Id.* at 1 (preamble).)

### ii. Effective date of the Consulting Agreement

54. The Consulting Agreement is "[e]ffective as of May 1, 2020," (*id.* at 1 (header)), the date on which "[t]he parties agree that [Yanker's] consulting services commenced … ," (*id.* ¶ 2).

### iii. Yanker's obligation to provide services to Zoomcar under the Consulting Agreement

55. Yanker agreed that his "consulting duties will include a broad range of business development services, including, but not limited to (a) planning, developing and overseeing the overall business development strategy of [Zoomcar], (b) working with the [Zoomcar] sales, marketing and investor relations teams to improve messaging and strategy, (c) developing sales and business strategy, (d) seeking and negotiating strategic and corporate transactions[,] and (e) assisting with market research." (*Id.* ¶ 1.)

### iv. Zoomcar's obligations to compensate Yanker for his services under the Consulting Agreement

56. Under the Consulting Agreement, Zoomcar promised to compensate Yanker for his services in two ways.

#### (a) The immediate equity award

57. First, Zoomcar agreed to "issue [Yanker] 112,309 shares of Common Stock" of the company "on November 2, 2020 … ." (*Id.* ¶ 3.)

58. Zoomcar issued 112,309 shares of Common Stock to Yanker on or about November 2, 2020.

#### (b) The contingent fee for "any Corporate Transaction"

59. Second, Zoomcar agreed to pay Yanker a contingent fee — defined as a "Performance Bonus" — "in connection with any Corporate Transaction … ." (*Id.* ¶ 6.)

60. "Corporate Transaction" is defined as "a transaction or related series of transactions involving a merger, share capital exchange, asset acquisition, share purchase, joint venture or partnership transaction, issuance of equity or debt securities, whether public or private (other than primarily for capital-raising purposes), reorganization or similar corporate transaction." (*Id.*)

61. The amount of the Performance Bonus payable by Zoomcar to Yanker in connection with any Corporate Transaction depends on the "aggregate consideration … payable by [Zoomcar] or to [Zoomcar]" in connection with the Corporate Transaction. (*Id.*)

62. The Performance Bonus is equal to:

    (a) "2.0% of the aggregate consideration, including non-cash consideration (including but not limited to debt or equity securities, upfront payments and milestone payments), payable by [Zoomcar] or to [Zoomcar] if it is at or below $100,000,000" (*id.*); or

    (b) "2.25% of the aggregate consideration if it is above $100,000,000," (*id.*); or

    (c) 2.5% of the aggregate consideration "if the … aggregate consideration is at or above $500,000,000 … ," (*id.*).

63. The Performance Bonus is payable in two installments: cash and non-cash. (*Id.*)

    (a) *Non-cash upon signing a definitive agreement.* "[T]he 'Non-Cash Performance Bonus' … will be paid in the form or warrants to purchase … shares of Common Stock of [Zoomcar]" and the "warrants shall be issued as promptly as practicable following the signing of a definitive agreement in respect of the Corporate Transaction … but in no event later than 10 business days after such signing." (*Id.*)

    (b) *Cash at closing.* "The cash portion of the Performance Bonus will be $1,000,000, payable at the closing of the Corporate Transaction … ." (*Id.*)

64. Section 6 of the Consulting Agreement sets out other detailed covenants concerning valuation, exercise, and taxation of the warrants that make up the non-cash portion of the Performance Bonus. (*Id.*)

65. Zoomcar and Yanker — and their respective counsel — mindfully negotiated the provisions of the Consulting Agreement regarding Yanker's Performance Bonus.

66. Notably, under an early (but never executed) draft of the Consulting Agreement exchanged between counsel on or about September 25, 2020, Zoomcar proposed to pay Yanker a

Performance Bonus only "[u]pon the completion of **any Corporate Transaction during the term** of th[e Consulting] Agreement (the 'Term') … ." (Emphasis added.)

67. By contrast, the final, operative version of the Consulting Agreement — negotiated by counsel and agreed by the parties — provides that Zoomcar will pay Yanker a Performance Bonus "Upon the completion of **any Corporate Transaction** … " — whether or not the Corporate Transaction falls during the term of the Consulting Agreement. (Consulting Agreement ¶ 6.)

68. Section 6 of the Consulting Agreement is a bargained-for clause negotiated by sophisticated parties represented by counsel. In it, Zoomcar knowingly and deliberately agreed to pay Yanker a Performance Bonus on "any Corporate Transaction," whether or not during the term of the Consulting Agreement.

69. The amount of Yanker's contingent compensation reflects the substantial and continuing value of Yanker's services to Zoomcar, as well as the heavy risk associated with a contingent-fee arrangement.

70. At the time Yanker signed the Consulting Agreement, it was far from certain that Zoomcar would remain in existence — let alone that CEO Mr. Moran would reverse his strategic and operational blunders, right the ship, and position the company for a Corporate Transaction.

    v.    **Termination rights under the Consulting Agreement**

71. Yanker agreed to "render services as an independent contractor," (*id.* ¶ 4), and that his "services to the Company will be at-will," (*id.* ¶ 7.)

72. Either party had the right to "terminate [Yanker's] service at any time, for any reason or no reason, **subject to [Yanker's] continuing right to any Performance Bonus**, as set forth in Paragraph 6 … ." (*Id.* (emphasis added).)

    vi.    **The parties chose New York law to govern the Consulting Agreement**

73. Zoomcar and Yanker agreed that the Consulting Agreement "shall be governed by and construed in accordance with the laws of the State of New York … ." (*Id.* ¶ 9.)

      **vii.**    **The Consulting Agreement is merged and integrated**

74.    The Consulting Agreement is a complete and integrated agreement that "constitutes the entire agreement between [Yanker] and [Zoomcar] with respect to the subject matter [of the Consulting Agreement] and supersedes any prior agreements." (*Id.*)

**D.**    **Yanker performed services for Zoomcar under the Consulting Agreement**

75.    From 2020 through 2022, Yanker rendered services to Zoomcar under the Consulting Agreement.

76.    In his years of service to Zoomcar under the Consulting Agreement, Yanker devoted more than a thousand hours of his time to the Zoomcar engagement.

77.    Between May 2020 and January 2022, Yanker met in-person with Zoomcar CEO Greg Moran approximately 30 times. All of those meetings were at offices and other locations in New York City, including (for example) offices of the investment firms SternAegis Ventures and ThinkEquity, as well as at the Harvard Club of New York City and various New York City restaurants.

78.    At their in-person meetings in New York City, Yanker provided strategic advice regarding Zoomcar to CEO Greg Moran.

79.    At their in-person meetings in New York City, Yanker and CEO Greg Moran discussed repositioning Zoomcar for an offering or other transaction.

80.    At their in-person meetings in New York City, Yanker and CEO Greg Moran discussed prospective deal partners for Zoomcar.

81.    Among other valuable services, Yanker provided strategic consulting services to identify issues that made it difficult for Zoomcar to attract investors; built dashboards and identified key performance indicators; provided corporate culture consulting to improve and restructure Zoomcar's talent and human resources; supervised a review of Zoomcar's technology platforms and software-as-a-service strategies; repositioned Zoomcar by identifying areas for correction; overhauled Zoomcar's marketing and investor materials; interfaced with Zoomcar's financial advisors and accountants to reposition the company for an offering or other transaction; and communicated with investors, prospective deal partners, and investment bankers.

E.  **Zoomcar completed a Corporate Transaction in April 2021**

82. In or about April 2021, Zoomcar executed a definitive agreement for an unregistered securities offering through which it raised $100,000,000 (the "2021 Corporate Transaction") at an enterprise valuation of $250,000,000.

83. SternAegis Ventures, a New York private investment bank, served as placement agent for Zoomcar's 2021 Corporate Transaction.

84. Yanker was a member of the Zoomcar "working group" of employees and outside advisors that guided Zoomcar through the 2021 Corporate Transaction.

85. Zoomcar paid SternAegis in excess of $10 million for its services in connection with the 2021 Corporate Transaction, along with an equity interest equal to approximately 10% of the issued shares.

86. Shortly before announcing the 2021 Corporate Transaction to the public — in or about April 2021 — SternAegis CEO Adam Stern learned of the Consulting Agreement between Zoomcar and Yanker.

87. Upon information and belief — informed by email correspondence among Yanker, CEO Moran, and Stern —Zoomcar's banker Mr. Stern was surprised and dismayed to learn that the Consulting Agreement obligated Zoomcar to pay Yanker a substantial Performance Bonus in connection with the 2021 Corporate Transaction.

88. Mr. Stern alerted Zoomcar's lawyers, members of its Board of Directors, and CEO Greg Moran, of Stern's concern that the Consulting Agreement — and Yanker's entitlement to cash and equity compensation under it — was a material obligation that should be disclosed to investors in the 2021 Corporate Transaction.

89. Mr. Stern feared that late disclosure of new obligations would delay or scuttle a mature Corporate Transaction already in progress.

90. Zoomcar CEO Greg Moran approached Yanker and his counsel at Akin Gump to request that Yanker agree to an "addendum" to the Consulting Agreement that would obviate Zoomcar's obligation to disclose the Consulting Agreement to investors.

91. Yanker and CEO Mr. Moran discussed Mr. Moran's desire to renegotiate the Consulting Agreement in a way that would avoid disclosure to prospective Zoomcar investors.

92. Moran feared that disclosing the Consulting Agreement he negotiated with Yanker would frustrate Zoomcar's ability to conclude a merger or securities offering, diminishing the value of Mr. Moran's own stake in the Company. And if Zoomcar had to revise its disclosures because Mr. Moran concealed a material corporate obligation from investors, it would impair the CEO's reputation and credibility.

93. During Mr. Moran's telephone discussions with Yanker — some of which were recorded — Mr. Moran reaffirmed Zoomcar's commitment to pay Yanker a Performance Bonus in connection with the 2021 Corporate Transaction.

94. Yanker declined to amend the Consulting Agreement.

95. Zoomcar did not disclose the Consulting Agreement to investors.

96. Instead, on information and belief, Mr. Moran caused Zoomcar to adopt the untenable and incorrect position that Yanker is simply not entitled to a Performance Bonus.

97. Zoomcar closed the 2021 Corporate Transaction in or about November 2021.

98. Zoomcar has never paid Yanker a Performance Bonus in connection with the 2021 Corporate Transaction.

99. Despite agreeing to pay Yanker a Performance Bonus in connection with the 2021 Corporate Transaction, Zoomcar CEO Mr. Moran now claims none is owed.

F.  **Zoomcar repudiated the Consulting Agreement in January 2022**

100. By letter dated January 7, 2022, Zoomcar CEO Greg Moran wrote to Yanker on behalf of the Zoomcar Board of Directors to terminate the Consulting Agreement and to repudiate all of Zoomcar's remaining obligations. (Ex. B.)

101. Zoomcar's repudiation letter stated: "We are writing to inform you that we are hereby terminating the [Consulting Agreement]." (*Id.*)

102. Zoomcar's letter continued: "To date, the Company has issued you 112,309 shares of Common Stock as compensation for your services under the agreement. As we have not entered into

any Corporate Transactions (as defined in the agreement) during your tenure, and none are currently in progress, this stock compensation represents the full and final compensation owed to you under the agreement, and neither you nor Zoomcar has any continuing rights or obligations under the agreement." (*Id.*)

103. Zoomcar's letter clearly and positively states Zoomcar's intention not to perform any further obligation to Yanker under the Consulting Agreement.

104. Zoomcar CEO Moran's January 7, 2022 letter was demonstrably false in several respects.

105. First, Zoomcar's assertion that "Zoomcar has [no] continuing … obligations under the Agreement" is flatly contrary to the Consulting Agreement. Section 7 of the Consulting Agreement unequivocally provides that "the Company may terminate [Yanker's] service at any time … **subject to [Yanker's] continuing right to any Performance Bonus** … ." (Ex. A ¶ 7 (emphasis added).)

106. Second, Zoomcar's assertion that Zoomcar "ha[s] not entered into any Corporate Transactions (as defined in the agreement) during [Yanker's] tenure" was false. Zoomcar closed the $100 million 2021 Corporate Transaction in 2021 — just months before Zoomcar repudiated the Consulting Agreement.

107. Third, Zoomcar's assertion that "no [Corporate Transactions] are currently in progress" on January 7, 2022 was also false. On information and belief — informed by email correspondence and recorded telephone calls — beginning in or before January 2022, CEO Greg Moran, other members of Zoomcar's management, and Zoomcar's outside financial advisors were pursuing potential Corporate Transactions, including potential acquisitions by special purpose acquisition companies ("SPACs").

108. In all events, the Consulting Agreement makes clear that Zoomcar's obligation to pay Yanker a Performance Bonus attaches to "any Corporate Transaction" whenever it occurs. (Ex. A ¶ 6.) Whether a Corporate Transaction occurred during Yanker's "tenure" — and whether a Corporate Transaction was "in progress" at the time of termination — are irrelevant to Zoomcar's obligations.

109. Zoomcar's letter purporting to relieve itself of the contractual obligation to pay Yanker his bargained-for compensation was conceived and sent in service to CEO Mr. Moran's scheme to conceal the Consulting Agreement from potential investors.

110. Yanker objected to Zoomcar's January 7, 2022 termination letter by informing the Company that termination of the Consulting Agreement did not extinguish Yanker's entitlement to a Performance Bonus.

**G.  Zoomcar completed a Corporate Transaction in October 2022**

111. According to materials filed with the SEC, on October 13, 2022, Zoomcar entered into a definitive Agreement and Plan of Merger and Reorganization (the "Definitive Merger Agreement") with Innovated International Merger Sub, Inc., a subsidiary of publicly-traded entity Innovative International Acquisition Corp. ("Innovative").

112. Innovative is a special purpose acquisition company or "SPAC."

113. Under the Definitive Merger Agreement, Zoomcar will merge with Innovative and become a public company listed on Nasdaq (the "2022 Corporate Transaction").[2]

114. The 2022 Corporate Transaction values Zoomcar at $456 million.

115. When announcing the 2022 Corporate Transaction, Innovative and Zoomcar jointly filed materials with the SEC touting Zoomcar's performance during the COVID-19 pandemic, including its "pivot from direct-leasing, or an ownership model, to inviting hosts to list their cars on its platform … [a] strategy [that] paid off, as [Zoomcar] opted for an asset-light and sustainable model." Yanker contributed essential services and strategic advice that allowed Zoomcar to achieve those initiatives.

116. Zoomcar did not pay Yanker any portion of a Performance Bonus when it entered the Definitive Merger Agreement in connection with the 2022 Corporate Transaction.

---

[2] On February 7, 2023, Innovative filed with the Securities and Exchange Commission a Registration Statement on Form S-4 related to the 2022 Corporate Transaction. That publicly-filed Registration Statement, as amended and inclusive of exhibits, is hereby incorporated by reference in this Complaint. A copy of the executed Definitive Merger Agreement dated October 13, 2022 between Zoomcar and Innovative was filed as Annex A to the Registration Statement. That executed Definitive Merger Agreement is annexed hereto as Exhibit C and, for the avoidance of doubt, is also incorporated by reference in this Complaint.

117. In its January 7, 2022 letter, (Ex. B), Zoomcar repudiated its obligation to pay Yanker a Performance Bonus in connection with and at the closing of the 2022 Corporate Transaction.

### FIRST CAUSE OF ACTION – BREACH OF CONSULTING AGREEMENT
### (2021 Corporate Transaction)

118. Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs.

119. The Consulting Agreement is an enforceable agreement between Plaintiff Yanker and Defendant Zoomcar.

120. Plaintiff Yanker performed all acts on his part to be performed, including without limitation rendering services to and for the benefit of Zoomcar pursuant to the Consulting Agreement.

121. Defendant Zoomcar willfully breached the Consulting Agreement by, among other things, failing to pay Yanker a Performance Bonus in the form and amount agreed upon in the Consulting Agreement upon the execution and closing of the 2021 Corporate Transaction.

122. As a result of its breach of contract, Defendant Zoomcar owes to Yanker not less than $5,625,000 — plus costs, attorney fees, and interest that continues to accrue.

### SECOND CAUSE OF ACTION – BREACH OF CONSULTING AGREEMENT
### (2022 Corporate Transaction)

123. Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs.

124. The Consulting Agreement is an enforceable agreement between Plaintiff Yanker and Defendant Zoomcar.

125. Plaintiff Yanker performed all acts on his part to be performed, including without limitation rendering services to and for the benefit of Zoomcar pursuant to the Consulting Agreement.

126. Defendant Zoomcar willfully breached the Consulting Agreement by, among other things, failing to pay Yanker a Performance Bonus in the form and amount agreed upon in the Consulting Agreement upon the execution and closing of the 2022 Corporate Transaction.

127. As a result of its breach of contract, Defendant Zoomcar owes to Yanker not less than $10,260,000 — plus costs, attorney fees, and interest that continue to accrue.

### THIRD CAUSE OF ACTION – ANTICIPATORY REPUDIATION

128. Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs.

129. The Consulting Agreement is an enforceable agreement between Plaintiff Yanker and Defendant Zoomcar.

130. Plaintiff Yanker performed all acts on his part to be performed, including without limitation rendering services to and for the benefit of Zoomcar pursuant to the Consulting Agreement.

131. Defendant Zoomcar's January 7, 2022 letter to Yanker unequivocally repudiated Zoomcar's obligations to perform under the Consulting Agreement, constituting an anticipatory breach of contract.

132. Defendant Zoomcar's anticipatory breach of contract has caused and will continue to cause damage to Plaintiff.

## FOURTH CAUSE OF ACTION – DECLARATORY JUDGMENT

133. Plaintiff re-alleges each and every allegation contained in the foregoing paragraphs.

134. At the time of the commencement of this action, pursuant to the Consulting Agreement, Plaintiff was and is entitled to receive from Defendant Zoomcar a Performance Bonus in as defined in the Consulting Agreement on the terms set forth in the Consulting Agreement.

135. The Consulting Agreement provides that any termination by Zoomcar of the Consulting Agreement is "subject to [Plaintiff's] continuing right to any Performance Bonus, as set forth in Paragraph 6" of the Consulting Agreement.

136. At the time of the commencement of this action, Defendant Zoomcar contends that it has no "continuing rights or obligations under" the Consulting Agreement.

137. There is an actual controversy over the parties' rights and obligations under the Consulting Agreement.

138. Accordingly, and pursuant to 28 U.S.C. §§ 2201-02, Plaintiff is entitled to a judgment declaring that he has a continuing right to payment under the Consulting Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Randall Yanker prays for relief against Defendant Zoomcar, Inc. as follows:

A. Awarding judgment in an amount in excess of the jurisdictional limits of this Court, and which will be determined at trial, together with attorneys' fees, interest, and the costs and disbursements of this action;

B. Awarding judgment for punitive damages in an amount to be determined at trial;

C. Ordering, adjudging and declaring that Plaintiff is entitled to payment by Defendant pursuant to the Consulting Agreement; and

D. Awarding such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable in accordance with Fed. R. Civ. P. 38.

Dated:   August 4, 2022
         New York, NY

MULLEN P.C.

By:   Wesley M. Mullen (WM1212)
      Vincent R. FitzPatrick III (VF7415)
      745 Fifth Avenue, Suite 500
      New York, NY 10151
      wmullen@mullenpc.com
      vfitzpatrick@mullenpc.com
      (646) 632-3718

      *Attorneys for Plaintiff Randall Yanker*